No. 26-10244

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

DEFENSE DISTRIBUTED,

Intervenor Plaintiff-Appellant,

v.

TODD WALLACE BLANCHE, Acting U.S. Attorney General, in his official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; ROBERT CEKADA, Director, U.S. Bureau of Alcohol, Tobacco and Firearms; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of Texas

## BRIEF FOR APPELLEES

BRETT A. SHUMATE
*Assistant Attorney General*

RYAN RAYBOULD
*United States Attorney*

BRAD HINSHELWOOD
DOMENIC CANONICO
*Attorneys, Appellate Staff*
*Civil Division, Room 7246*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-8189*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties. 5th Cir. R. 28.2.1

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for defendants-appellees believes that the issues in this appeal are straightforward and that oral argument therefore is not needed. However, counsel is prepared to deliver argument if the Court believes it would be of assistance.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ..................................................................................1

STATEMENT OF THE ISSUE.........................................................................................1

STATEMENT OF THE CASE...........................................................................................1

     A.      Statutory and Regulatory Background..............................................1

     B.      Procedural Background......................................................................5

SUMMARY OF ARGUMENT.........................................................................................8

STANDARD OF REVIEW ........................................................................................... 11

ARGUMENT ................................................................................................................ 12

I.     Defense Distributed Is Not Likely To Succeed On The Merits. ....................... 12

     A.      Defense Distributed lacks standing. ...............................................12

           1.      Defense Distributed's requested relief will not redress its alleged injury with respect to the Polymer80 product and the two M1911 products.........................................................12

           2.      Defense Distributed has not established an injury in fact with respect to the three G80 products.............................................14

     B.      Defense Distributed is not likely to succeed on the merits of its void-for-vagueness claim. ...............................................................15

     C.      Defense Distributed is not likely to succeed on the merits of its Second Amendment claim..................................................................27

II.    None Of The Other Equitable Factors Weighs In Favor Of Defense Distributed. ................................................................................................... 36

CONCLUSION ............................................................................................................ 42

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Bondi v. VanDerStok,*
604 U.S. 458 (2025)......................................................1, 2, 3, 4, 5, 6, 8, 13, 16, 17,
17-18, 20, 26, 32, 38, 40

*Boyce Motor Lines, Inc. v. United States,*
342 U.S. 337 (1952)................................................................................ 16, 20

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
98 F.4th 220 (5th Cir. 2024) ........................................................ 12, 36, 36-37

*City of El Cenizo v. Texas,*
890 F.3d 164 (5th Cir. 2018) ................................................................... 19, 23

*Corrosion Proof Fittings v. EPA,*
947 F.2d 1201 (5th Cir. 1991) .......................................................................28

*Cox v. Louisiana,*
379 U.S. 559 (1965).......................................................................................19

*Deepwater Horizon, In re,*
857 F.3d 246 (5th Cir. 2017) .........................................................................28

*District of Columbia v. Heller,*
554 U.S. 570 (2008).........................................................................27, 28, 29

*Garland v. Blackhawk Mfg. Grp., Inc.,*
144 S. Ct. 338 (2023) ................................................................................ 5, 40

*Garland v. VanDerStok,*
144 S. Ct. 44 (2023)................................................................................... 5, 40

*Gazzola v. Hochul,*
88 F.4th 186 (2d Cir. 2023)............................................................................30

*Haaland v. Brackeen,*
599 U.S. 255 (2023)................................................................................... 12, 13

*Johnson v. United States,*
576 U.S. 591 (2015)........................................................................ 15, 16, 24, 25

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)........................................................................................39

*McRorey v. Garland,*
99 F.4th 831 (5th Cir. 2024) ............................................................ 29, 30

*Morehouse Enters., LLC v. ATF,*
78 F.4th 1011 (8th Cir. 2023) ................................................................31

*Munn v. City of Ocean Springs,*
763 F.3d 437 (5th Cir. 2014) .................................................................20

*Murthy v. Missouri,*
603 U.S. 43 (2024).................................................................... 12, 14, 15

*Nash v. United States,*
229 U.S. 373 (1913).................................................................................16

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022)........................................................27, 29-30, 30, 31

*Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman,*
981 F.3d 347 (5th Cir. 2020) (en banc)................................................11

*Reese v. ATF,*
127 F.4th 583 (5th Cir. 2025) ...............................................................30

*Roark & Hardee LP v. City of Austin,*
522 F.3d 533 (5th Cir. 2008) .................................................................20

*Sessions v. Dimaya,*
584 U.S. 148 (2018).................................................................................16

*Siders v. City of Brandon,*
123 F.4th 293 (5th Cir. 2024) ...............................................................36

*Speech First, Inc. v. Fenves,*
979 F.3d 319 (5th Cir. 2020) ........................................................ 14, 15

*Texas v. Biden,*
10 F.4th 538 (5th Cir. 2021) ..................................................................38

*Trump v. Boyle,*
606 U.S. ___, 145 S. Ct. 2653 (2025) ..................................................40

*United States v. Branson,*
139 F.4th 475 (5th Cir. 2025) ......................................................... 21, 22

*United States v. Clark,*
  582 F.3d 607 (5th Cir. 2009) .................................................................21

*United States v. Clinical Leasing Serv., Inc.,*
  925 F.2d 120 (5th Cir. 1991) ............................................................ 21, 23

*United States v. Comeaux,*
  179 F.4th 297 (5th Cir. 2026) ...............................................................31

*United States v. Conlan,*
  786 F.3d 380 (5th Cir. 2015) ................................................................18

*United States v. Hemani,*
  608 U.S. __, 146 S. Ct. 1677 (2026) ................................................27-28

*United States v. Kent,*
  175 F.3d 870 (11th Cir. 1999) ..............................................................24

*United States v. Lim,*
  444 F.3d 910 (7th Cir. 2006) ........................................................... 19, 26

*United States v. Peterson,*
  161 F.4th 331 (5th Cir. 2025) ......................................................... 30, 31

*United States v. Powell,*
  423 U.S. 87 (1975).......................................................................18, 19, 20

*United States v. Quiroz,*
  449 F.2d 583 (9th Cir. 1971) ................................................................24

*United States v. Rahimi,*
  602 U.S. 680 (2024).............................................................................27

*United States v. Shrader,*
  675 F.3d 300 (4th Cir. 2012) ...............................................................20

*United States v. Uhlenbrock,*
  125 F.4th 217 (5th Cir. 2024) ..............................................................21

*United States v. Vereen,*
  152 F.4th 89 (2d Cir. 2025)..................................................................34

*United States v. Vlha,*
  142 F.4th 1194 (9th Cir. 2025)..............................................................30

*VanDerStok v. Garland*,
  86 F.4th 179 (5th Cir. 2023) ...................................................................................6

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982)............................................................................ 18, 21, 22, 23

*Wang v. Paxton*,
  161 F.4th 357 (5th Cir. 2025) ...............................................................................15

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989)...............................................................................................16

*Warth v. Seldin*,
  422 U.S. 490 (1975)...............................................................................................28

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................................12

*Women's Med. Ctr. of Nw. Houston v. Bell*,
  248 F.3d 411 (5th Cir. 2001) ................................................................................18

**Statutes:**

Gun Control Act of 1968 (GCA),
  Pub. L. No. 90-618, 82 Stat. 1213 .........................................................................1
    18 U.S.C. § 921(a)(3) ..................................................................................... 2, 6, 24
    18 U.S.C. § 921(a)(3)(A)....................................................................................3, 23
    18 U.S.C. § 921(a)(3)(B) ............................................................... 9, 16, 20, 35, 38
    18 U.S.C. § 922(k).......................................................................................................2
    18 U.S.C. § 922(t).......................................................................................................1
    18 U.S.C. § 923(a) ...............................................................................................1, 30
    18 U.S.C. § 923(d) ....................................................................................................30
    18 U.S.C. § 923(g)(1)(A) .............................................................................................1
    18 U.S.C. § 923(i) .......................................................................................................2
    18 U.S.C. § 926(a) ......................................................................................................2

26 U.S.C. § 5845(b) ....................................................................................................23

26 U.S.C. § 5485(c)...............................................................................................23, 24

26 U.S.C. § 5485(d) ....................................................................................................23

26 U.S.C. § 5485(f) .....................................................................................................23

26 U.S.C. § 5485(h) ..........................................................................................23

28 U.S.C. § 1292(a)(1) ........................................................................................1

28 U.S.C. § 1331 .................................................................................................1

## Regulatory Materials:

27 C.F.R. § 478.11 .......................................................................4, 13, 18, 25

27 C.F.R. § 478.12 .................................................................................................13

27 C.F.R. § 478.12(c).................................................4, 15, 18, 19, 25, 26, 27, 34

27 C.F.R. § 478.92(c).................................................................................20-21, 38

Exec. Order No. 14,206,
   90 Fed. Reg. 9503 (Feb. 12, 2025) .............................................................7

## Other Authorities:

John G.W. Dillin, *The Kentucky Rifle* (1975) ........................................................34

87 Fed. Reg. 24,652 (Apr. 26, 2022) ......................3, 16, 17, 26, 29, 32, 33, 34, 35, 36, 41

James B. Whisker, *The Gunsmith's Trade* (1992) ..................................................34

## STATEMENT OF JURISDICTION

Defense Distributed invoked the district court's jurisdiction under 28 U.S.C. § 1331 and filed a motion for a preliminary injunction on June 6, 2025. ROA.5480-83. The district court has not acted on that motion. Defense Distributed appealed on March 12, 2026, invoking this Court's jurisdiction under 28 U.S.C. § 1292(a)(1) on the ground that the district court's inaction amounts to an effective denial of a preliminary injunction. ROA.6181.

## STATEMENT OF THE ISSUE

Whether Defense Distributed has demonstrated that it is entitled to the extraordinary remedy of a preliminary injunction on the grounds that the challenged rule is unconstitutionally vague and violates the Second Amendment.

## STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

Congress enacted the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (GCA), to tamp down on criminals' easy access to "largely untraceable guns." *Bondi v. VanDerStok*, 604 U.S. 458, 462 (2025). The GCA responds to that problem in several primary ways, including: by requiring firearms dealers, importers, and manufacturers to obtain licenses, 18 U.S.C. § 923(a), to keep records of certain business transactions, *id.* § 923(g)(1)(A), and to conduct background checks before transferring firearms to private buyers, *id.* § 922(t); by requiring importers and manufacturers to "identify by means of a serial number … each firearm imported or

manufactured," *id.* § 923(i); and by prohibiting any person from transporting, shipping, receiving, or possessing "any firearm which has had the … serial number removed," *id.* § 922(k). Together, these provisions help "to keep 'guns out of the hands of criminals'" and "'assist law enforcement authorities in investigating serious crimes' by permitting them 'to determine where, by whom, or when' a firearm was manufactured and to whom it was 'sold or otherwise transferred.'" *VanDerStok*, 604 U.S. at 462 (citation omitted).

Each of those statutory "mandates appl[ies] to 'firearm[s].'" *VanDerStok*, 604 U.S. at 462 (second alteration in original). "And the law defines that key term broadly." *Id.* Section 921(a)(3) defines "firearm" to mean "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3). "Thanks to this generous definition, the GCA has long been understood to reach everything from run-of-the-mill rifles to novelty umbrella guns." *VanDerStok*, 604 U.S. at 463.

In 2022, invoking its authority to issue "rules and regulations … necessary to carry out" the GCA, 18 U.S.C. § 926(a), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) adopted "a new rule designed to combat the proliferation of" unserialized firearms, often known as "ghost guns," *VanDerStok*, 604 U.S. at 464. These firearms are often acquired initially as weapon parts kits. Made possible by

2

"new technologies like 3D printing and reinforced polymers," weapon parts kits are kits "that individuals can assemble into functional firearms in their own homes," and they "vary widely both in how complete they come and in how much work is required to finish them." *Id.* at 463. Some kits require significant time, effort, or expertise to assemble, while others "can be completed in perhaps half an hour using commonly available tools." *Id.* Although hobbyists purchase these kits for innocent purposes, "criminals also find them attractive." *Id.* "That is largely due to how the kits are sold"—"[s]ome manufacturers and dealers take the position that weapon parts kits do not qualify as 'firearms' subject to the GCA," so they claim "they are free to sell their products without obtaining a federal license, conducting background checks, maintaining sales records, or marking components with serial numbers." *Id.* at 463-64. As sales of weapon parts kits have grown, law enforcement agencies "have 'confronted an explosion of crimes' involving … 'ghost guns,'" and "[e]fforts to trace the ownership of these weapons … have proven 'almost entirely futile,'" frustrating police departments' abilities to investigate crimes. *Id.* at 464.

ATF's 2022 rule sought to clarify the scope of the GCA's coverage in light of these technological and manufacturing developments, and thus "to ensure proper licensing, marking, recordkeeping, and background checks with respect to certain weapon parts kits." 87 Fed. Reg. 24,652, 24,653 (Apr. 26, 2022); *see also id.* at 24,655-60, 24,662. Two provisions of that rule are relevant here. First, the rule interprets 18 U.S.C. § 921(a)(3)(A)'s language—which defines a "firearm" as "any weapon

3

(including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive"—to "include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11; *see VanDerStok*, 604 U.S. at 464. And the rule explains that, in determining "whether a kit 'may readily be converted' into a working gun," ATF "will consider several factors, including the time, ease, expertise, and equipment required to complete a weapon, as well as the availability of other necessary parts." *VanDerStok*, 604 U.S. at 464-65 (quoting 27 C.F.R. § 478.11).

Second, since, under subparagraph (B) of § 921(a)(3), the "frame or receiver" of a weapon covered by subparagraph (A) qualifies on its own as a firearm, the rule clarifies that a "frame or receiver" "include[s] a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). But the rule also emphasizes that the GCA does not apply "until an object has 'reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon.'" *VanDerStok*, 604 U.S. at 465 (quoting 27 C.F.R. § 478.12(c)). Thus, "a forging, casting, printing, extrusion, unmachined body, or similar article" is not a "frame or receiver"—and so not a "firearm"—under the GCA. 27 C.F.R. § 478.12(c).

4

### B. Procedural Background

Before the rule took effect, several manufacturers and dealers of weapon parts kits and unfinished frames and receivers challenged the rule. *See VanDerStok*, 604 U.S. at 466. Defense Distributed intervened as a plaintiff, ROA.1545, 1928, claiming, among other things, that the rule's definition of "frame or receiver" exceeded ATF's statutory authority, that the definition was void for vagueness under the Due Process Clause, and that the rule violated the Second Amendment, ROA.2369, 2374-76. Defense Distributed claimed that it was injured by the rule because its "entire business model has depended on its ability," without obtaining a federal firearms license, "to deal in items that" the rule clarifies are subject to the GCA, ROA.2352.

In June 2023, the district court granted summary judgment to plaintiffs and vacated the rule, on the ground that the rule exceeded ATF's statutory authority because it reached beyond the GCA's definition of "firearm." ROA.4802, 4804-05. In August 2023, the Supreme Court granted the government's application for a stay of the district court's judgment pending appeal. *Garland v. VanDerStok*, 144 S. Ct. 44 (2023). Defense Distributed and one other plaintiff then moved the district court for an injunction pending appeal. The district court granted that relief, enjoining ATF from applying the rule to Defense Distributed pending appeal, ROA.5311-12, but the Supreme Court vacated that injunction, *Garland v. Blackhawk Mfg. Grp., Inc.*, 144 S. Ct. 338 (2023).

This Court thereafter largely affirmed the district court's grant of summary judgment to plaintiffs, concluding that ATF's definitions of "firearm" and "frame or receiver" reached more broadly than the text of the GCA. *VanDerStok v. Garland*, 86 F.4th 179, 190, 195 (5th Cir. 2023).

In March 2025, the Supreme Court reversed, holding that the GCA "embraces, and thus permits ATF to regulate," at least "some weapon parts kits and unfinished frames or receivers" covered by the rule. *VanDerStok*, 604 U.S. at 484. The Court reached that conclusion after determining that some specific weapon parts kits and partially complete frames in the record, and described by the rule, were plainly "firearms" under the GCA's definition in 18 U.S.C. § 921(a)(3). *See id.* at 468-72, 478-79. And in applying the statute to the facts at hand, the Court commented specifically on one of the products at issue in this appeal, observing that "an ordinary speaker might well call Polymer80's product a firearm 'frame,' even though a little work is required to complete it. Just look again at the second photo. What else would you call it?" *Id.* at 479.

On remand in the district court, all plaintiffs except for Defense Distributed asked the court to stay proceedings pending the Attorney General's review, as directed by an executive order issued by President Trump in February 2025, of all "[r]ules promulgated … by [ATF], from January 2021 through January 2025, pertaining to firearms and/or Federal firearms licensees," as well as of "[t]he positions taken by the United States in any and all ongoing and potential litigation" that could

6

affect "Second Amendment rights." ROA.5470-71 (first, third, and fourth alterations in original) (quoting Exec. Order No. 14,206, § 2(b)(ii), (v), 90 Fed. Reg. 9503, 9503 (Feb. 12, 2025)).

Rather than join in that request, Defense Distributed filed the preliminary-injunction motion at issue here, seeking an injunction based on its void-for-vagueness and Second Amendment claims barring ATF from enforcing the rule with respect to six specific products: three products Defense Distributed calls "pistol frame predecessors," ROA.5513 (quotation marks omitted)—the Polymer80 80% Frame; the M1911 80% Frame:45ACP; and the M1911 80% Frame:9mm/10mm/.38 Super/.40 S&W—and three other products that Defense Distributed has described only by name—the G80 Build Kit; the G80 Unfinished Receiver; and the G80 Grip Module. ROA.5480-505; *see* Br. 38. In March 2026, without a ruling on its motion by the district court, Defense Distributed appealed the court's "refusal of the preliminary injunction." ROA.6181. Defense Distributed thereafter moved the district court for an injunction pending appeal, ROA.6187-88, which the court denied, ROA.6211.

In April 2026, the district court emphasized its intention "to 'resolve *all* remaining issues involved in this lawsuit'" and accordingly ordered all parties to promptly move for summary judgment. ROA.6226. In response, all plaintiffs except for Defense Distributed and one other stipulated to dismissal of all remaining claims. Dkt. 315. Pursuant to the briefing schedule set by the court, the two remaining

plaintiffs and the government filed cross-motions for summary judgment. Dkts. 316-19. The motions are fully briefed as of July 30, 2026. *See* Dkt. 329.

**SUMMARY OF ARGUMENT**

In *Bondi v. VanDerStok*, 604 U.S. 458 (2025), the Supreme Court upheld the ATF rule at issue here against a facial challenge brought by Defense Distributed (among other plaintiffs). In doing so, the Court specifically examined one of Defense Distributed's products and explained that it (and products like it) met the GCA's definition of a "firearm." *Id.* at 479, 481. Defense Distributed now seeks a preliminary injunction barring application of the ATF rule at issue here—but not the GCA—to six of its products, including the one the Supreme Court already held covered by the GCA, two products Defense Distributed has never disputed are essentially identical to that product, and three other products for which Defense Distributed has refused to seek ATF's view on whether they are covered by the GCA.

Defense Distributed's claims have no merit. At the outset, Defense Distributed has failed to establish standing. With respect to half of the products at issue, the requested preliminary injunction would do nothing to remedy its alleged harm, because the Supreme Court has already made clear those products are firearms under the GCA, which Defense Distributed does not challenge. And as to the other half, Defense Distributed has not explained why the rule arguably covers them while the GCA does not, and thus has failed to show how it suffers any injury attributable to the *rule* with respect to those products.

8

Even if Defense Distributed could establish standing, its claims fail on the merits. ATF's rule is not close to being unconstitutionally vague. The rule simply clarifies the application of the statutory standard as it applies under current technological and manufacturing conditions. Defense Distributed does not try to explain how a rule clarifying an undisputedly constitutional statute could somehow be vague. And the Supreme Court in *VanDerStok* had little difficulty applying the rule and the statute to specific items (including one of the very items at issue here), demonstrating that the rule is not vague at least as a general matter.

Regardless, the rule satisfies the modest demands of vagueness review. A law must give ordinary people fair notice of what conduct is prohibited and must not invite arbitrary enforcement by government officials. The rule sets out, in terms that are neither standardless nor difficult to understand, objective features of partially complete frames or receivers and kits that determine whether an item is a "frame or receiver" for purposes of 18 U.S.C. § 921(a)(3)(B), and thus regulated by the GCA. The rule's terms are at least as clear as other legal standards that the Supreme Court and this Court have sustained in the face of vagueness challenges. And as the Supreme Court has emphasized, legal standards commonly present some difficult applications at the margins without raising due-process concerns.

In any event, Defense Distributed makes no effort to show that the rule is vague as applied to any of its products, as a successful vagueness challenge would require. And if Defense Distributed does genuinely harbor uncertainty about how any

9

of its products are classified under the rule, that is a problem of its own making. ATF has created an administrative classification process by which it offers to advise members of the public as to whether a particular item or product is a firearm for purposes of the GCA, and it has expressly offered to make such a determination for Defense Distributed's products on an expedited basis. Yet Defense Distributed has rebuffed those offers.

Defense Distributed's Second Amendment claim is similarly unavailing. As a business, Defense Distributed does not have Second Amendment rights to assert, and to the extent Defense Distributed wishes to assert the rights of its customers, it has not tried to show that it has third-party standing to do so.

Even beyond that threshold failing, the rule does not impose *any* new obligations on gun owners or would-be gun owners. All that the rule does is clarify the scope of the GCA's application. All substantive requirements, then, flow from the GCA, which Defense Distributed expressly does not challenge. And both the Supreme Court and this Court have made clear that ancillary conditions on firearms transactions—like the GCA's requirements to obtain a federal firearms license and comply with recordkeeping, serialization, and background-check requirements—do not infringe the Second Amendment rights of individuals in any event.

Defense Distributed's contrary arguments proceed from the premise that the rule imposes some new obligation not already imposed by the GCA. But Defense Distributed does nothing to establish that premise, such as by providing any argument

10

that its products are covered by the rule (but not the GCA). Defense Distributed cannot maintain a Second Amendment challenge based on an abstract belief that the rule might infringe the Second Amendment in some unidentified circumstance. And the rule itself is clear that it does not affect self-manufacture of firearms or regulate any firearm parts beyond what the GCA covers. The historical traditions Defense Distributed asserts related to parts and self-manufacture are thus entirely beside the point.

Finally, none of the other equitable factors supports issuing a preliminary injunction, as the Supreme Court twice previously recognized in granting interim relief in this litigation. Defense Distributed does not establish irreparable harm: its asserted constitutional injuries are illusory, and its supposed economic injuries, to the extent they exist at all, are not attributable to the rule. The balance of harms and the public interest, which merge here, decidedly favor the government, which has a strong interest in the full enforcement of the relevant provisions of the rule. Those provisions are designed to respond to the serious problem of the rising prevalence of crimes involving ghost guns.

## STANDARD OF REVIEW

The denial of a preliminary injunction is reviewed for abuse of discretion. *Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 354 (5th Cir. 2020) (en banc).

**ARGUMENT**

To obtain the extraordinary remedy of a preliminary injunction, Defense Distributed "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first two factors "are the most critical." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 233 (5th Cir. 2024) (quotation marks omitted). And the final two factors "merge when the government opposes an injunction." *Id.* at 254.

**I. Defense Distributed Is Not Likely To Succeed On The Merits.**

**A. Defense Distributed lacks standing.**

     **1. Defense Distributed's requested relief will not redress its alleged injury with respect to the Polymer80 product and the two M1911 products.**

To establish standing, the plaintiff must demonstrate that its injury is "likely to be redressed" by the judicial relief it seeks. *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023) (quotation marks omitted). Absent that possibility, the plaintiff lacks a sufficient "stake in the outcome of [a] controversy as to warrant [its] invocation of federal-court jurisdiction." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quotation marks omitted). At a minimum, Defense Distributed lacks standing to seek the requested preliminary injunction with respect to the Polymer80 product and the two M1911 products because that relief would not address its asserted injury.

12

Defense Distributed seeks an injunction barring ATF "from enforcing the challenged redefinition of 'firearm' in 27 C.F.R. §§ 478.11 and … 478.12 against [it] vis-à-vis" six specified products. Br. 38 (citation omitted). But, with respect to the Polymer80 and M1911 products, such an injunction would do nothing to redress Defense Distributed's asserted injury, which is that it is not permitted to deal in those items without complying with the GCA. Regardless of whether the challenged rule remains in effect, the Supreme Court's decision in *VanDerStok* makes clear that those three items are subject to the GCA. The Court explained that the Polymer80 product at issue here "qualifies as a 'frame' for purposes of" § 921(a)(3)(B) of the GCA. *Bondi v. VanDerStok*, 604 U.S. 458, 479 (2025). The same is true, the Court said, of "product[s] like [it]," *id.* at 481, which includes the two M1911 products, *see* ROA.5490, 5550. In other words, even if the rule is enjoined, *VanDerStok* establishes that the GCA prohibits Defense Distributed from dealing in those items without complying with the statutory requirements. And because Defense Distributed has expressly disavowed any challenge to the GCA, *see* Br. 27; ROA.5601, Defense Distributed's requested injunction "would not give [it] legally enforceable protection from the … harm" of being subject to the statute, *Brackeen*, 599 U.S. at 293. In short, even if Defense Distributed could demonstrate that a preliminary injunction is warranted, an injunction could not extend to these three products.

### 2. Defense Distributed has not established an injury in fact with respect to the three G80 products.

In a pre-enforcement suit like this one, the plaintiff must demonstrate an injury in fact by showing, among other things, that it intends to engage in conduct that is "arguably proscribed, or at least arguably regulated," by the challenged law. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 332 (5th Cir. 2020). It is the plaintiff's burden to "support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Murthy*, 603 U.S. at 58. At the preliminary-injunction stage, that requires the plaintiff to put forth evidence to "make a 'clear showing' that [it] is 'likely' to establish … standing." *Id.*

Defense Distributed has failed to establish an injury in fact with respect to the three G80 products. That is because its request for a preliminary injunction is wholly devoid of any explanation or evidence as to why its proposed course of conduct— dealing in these products—is arguably covered by ATF's rule.[1] In its motion for a preliminary injunction, Defense Distributed asserted that it intends to "market its important new G80 products free from" the rule. ROA.5491. But nowhere does it explain, in the first place, *why* it believes the rule may cover those products—in other words, what features of those products lead it to believe that they are "arguably

---

[1] Defense Distributed also did not explain why the Polymer80 product and the two M1911 products are arguably covered by the rule. However, because the Supreme Court's decision in *VanDerStok* makes clear that these items are covered by the GCA, its failure to do so is beside the point—as discussed, its standing with respect to those items fails on redressability grounds.

regulated" by the rule and thus the GCA.  *Speech First*, 979 F.3d at 332.  Given its failure to establish that the rule at least arguably covers the G80 products, there is no basis for concluding that Defense Distributed faces any harm at all from the rule with respect to these items.  *See Wang v. Paxton*, 161 F.4th 357, 360 (5th Cir. 2025) (holding that the plaintiff lacked pre-enforcement standing because he "failed to allege that" the challenged law "arguably proscribe[d his] conduct").  Defense Distributed therefore has not carried its burden to "support each element of standing 'with the manner and degree of evidence required'" to obtain a preliminary injunction.  *Murthy*, 603 U.S. at 58.

**B.      Defense Distributed is not likely to succeed on the merits of its void-for-vagueness claim.**

ATF's rule defines frames or receivers covered by the GCA to include "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver."  27 C.F.R. § 478.12(c).  Like countless legal rules, this definition "call[s] for the application of a qualitative standard" to "real-world" facts.  *Johnson v. United States*, 576 U.S. 591, 604 (2015).  It is fully consistent with the Due Process Clause, and Defense Distributed is therefore not likely to succeed on the merits of its due-process claim.

The constitutional guarantee of due process of law prohibits the government from imposing criminal sanctions under a "law so vague that it fails to give ordinary

15

people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595. As the Supreme Court has recognized, however, laws inevitably "must deal with untold and unforeseen variations in factual situations," and thus "no more than a reasonable degree of certainty can be demanded" from a law's terms. *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952). The law is "full of instances where a man's fate depends on his estimating rightly … some matter of degree," *Johnson*, 576 U.S. at 604 (alteration in original) (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)), and qualitative or otherwise "non-numeric standard[s]" are not "problematic" so long as they provide fair notice of what is prohibited and do not invite arbitrary enforcement, *Sessions v. Dimaya*, 584 U.S. 148, 161 (2018). The Due Process Clause does not demand "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

1. As the government has continually recognized in this litigation, Congress supplied the controlling legal standard for what constitutes a "frame or receiver" under the GCA in 18 U.S.C. § 921(a)(3)(B). *See, e.g.*, Brief for the Petitioners 31, *VanDerStok*, 604 U.S. 458 (No. 23-852), 2024 WL 3344939, at *31. And it has long been ATF's view that, as a statutory matter, "a piece of metal, plastic, or other material becomes a frame or receiver … when it is 'brought to a stage of completeness that will allow it to accept the firearm components [for] which it is designed … using basic tools in a reasonable amount of time.'" 87 Fed. Reg. at 24,685; *see also VanDerStok*, 604 U.S. at 480. That understanding simply reflects a

16

"natural reading of the statute."  Brief for the Petitioners 35, *VanDerStok*, 604 U.S. 458 (No. 23-852), 2024 WL 3344939, at *35.

In recent years, ATF has noted confusion regarding the statute's scope and observed intentional evasion of statutory requirements, both relating to technological developments in firearms manufacturing.  *E.g.*, 87 Fed. Reg. at 24,652, 24,655, 24,659, 24,669.  ATF accordingly promulgated the 2022 rule to "clarify[] that incomplete frames or receivers," as well as kits, "can be firearms within the meaning of the governing law"—that is, the GCA.  *Id.* at 24,686; *see id.* at 24,652 ("ATF is promulgating a rule that would bring clarity to the definition of 'frame or receiver' … .").  The rule's definition of "frame or receiver" thus aims to explain, in light of technological developments, how unfinished frames or receivers and kits are classified under the GCA.

Given that the rule's basic purpose is to *clarify* the controlling statutory standard, it would be surprising for the rule to flunk the modest requirements of vagueness analysis.  Indeed, unless the statute is unconstitutionally vague (a charge not advanced here), it is difficult even to understand how the rule—to the extent it is authorized by the statute—could suffer from any vagueness defects at all, because the rule to that extent simply implements the law enacted by Congress.  In *VanDerStok*, the Supreme Court had little trouble concluding that the rule's definition of "frame or receiver" tracks the statutory standard at a minimum in some core class of cases, 604 U.S. at 484, and that certain products are clearly covered by the rule and the statute, *id.*

17

at 478-81.  *VanDerStok* thus demonstrates that, at least as a general matter, neither the rule nor the statute is unduly vague.

In any event, even considered on its own, the rule is more than sufficient to satisfy the demands of due process.  The rule's core definitional provision for unfinished frames or receivers explains that the GCA's requirements cover "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver."  27 C.F.R. § 478.12(c).  This definition is "readily understandable by most people."  *See United States v. Conlan*, 786 F.3d 380, 386 (5th Cir. 2015).  It makes clear that a partially complete frame or receiver or a kit only comes within the scope of the rule and the statute if it is capable of being made functional "readily"—a term that, as the rule further explains, refers to a "process" or "action" "that is fairly or reasonably efficient, quick, and easy."  27 C.F.R. § 478.11.  That standard demands focus on an item's "objective features," *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 501 (1982)—not on "factors over which [a seller] ha[s] no control," *United States v. Powell*, 423 U.S. 87, 93 (1975); *cf. Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001) (challenged regulation was vague because it imposed sanctions "based not on … objective behavior, but on the subjective viewpoints of others").  A law is not vague where, as here, "[i]t intelligibly forbids a definite course of conduct,"

even if "doubts as to the applicability of the language in marginal fact situations may be conceived." *Powell*, 423 U.S. at 93.

The rule provides further clarity by expressly excluding from its scope "a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon." 27 C.F.R. § 478.12(c). That clarification places limits on any residual enforcement discretion that the core definitional terms might leave ATF. And the rule also advises the public that ATF will consider "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials" that come with a part or kit when determining whether it qualifies as a frame or receiver, thus providing notice that ATF considers such associated materials relevant to its assessment of an item. *Id.* Together, these additional aspects of the rule further diminish any vagueness concerns.

The fact that some "marginal situations" may exist under the rule plainly does not create a due-process problem. *United States v. Lim*, 444 F.3d 910, 916 (7th Cir. 2006); *see Powell*, 423 U.S. at 92-94. Marginal situations are ubiquitous in law, and the Supreme Court and this Court have recognized that similar standards that potentially require judgments at the margins are not unconstitutionally vague. *E.g.*, *Powell*, 423 U.S. at 88 (firearm "capable of being concealed on the person"); *Cox v. Louisiana*, 379 U.S. 559, 568 (1965) ("near" a courthouse); *City of El Cenizo v. Texas*, 890 F.3d 164, 190 (5th Cir. 2018) (practice that "materially limits the enforcement of the

19

immigration laws"); *Munn v. City of Ocean Springs*, 763 F.3d 437, 440 (5th Cir. 2014) (noise that "annoys" a reasonable person); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 553 (5th Cir. 2008) (requirement to "take necessary steps to prevent … smoking"). Indeed, the Supreme Court in *VanDerStok* recognized that even the "unadorned artifact nouns" "frame" and "receiver" used in the GCA may admit of some "ambiguities at [their] outer boundaries." 604 U.S. at 482, 484. But 18 U.S.C. § 921(a)(3)(B) is not unconstitutionally vague simply because its application may present some marginal situations.

Courts do not "declar[e] a [law] vague simply because it does not include the most elaborate or the most specific definitions possible." *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012). For due-process purposes, it is sufficient that the rule gives "clear notice that a reasonably ascertainable standard of conduct is mandated"; beyond that, "it is for [the public] to insure that [their] actions do not fall outside the legal limits." *Powell*, 423 U.S. at 92; *see Boyce Motor Lines*, 342 U.S. at 340 ("Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.").

Moreover, to the extent Defense Distributed or others have genuine doubt about the application of the statute and rule (though, as noted, Defense Distributed has not articulated any argument on that score), the rule provides for a voluntary classification process by which ATF may issue "a determination (classification) to a person whether an item, including a kit, is a firearm … as defined in this part." 27

20

C.F.R. § 478.92(c).  The availability of "an administrative process" "to clarify the

meaning of [a] regulation[]" significantly diminishes any vagueness concerns.  *United

States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991) (quoting *Village of

Hoffman*, 455 U.S. at 498).

The rule thus fits comfortably within the space that the Due Process Clause

affords to the government in defining prohibited conduct.

2.       Defense Distributed cannot complain otherwise.  "Vagueness challenges

to [laws] which do not involve First Amendment freedoms must be examined in the

light of the facts of the case at hand."  *United States v. Branson*, 139 F.4th 475, 478 (5th

Cir. 2025) (quoting *Village of Hoffman*, 455 U.S. at 495 n.7); *see also United States v.

Uhlenbrock*, 125 F.4th 217, 224 (5th Cir. 2024) ("[A] party who engages in some

conduct that is clearly proscribed cannot complain of the vagueness of the law as

applied to the conduct of others." (quoting *United States v. Clark*, 582 F.3d 607, 613

(5th Cir. 2009))).  So, "[a]s a threshold matter," Defense Distributed "must show that

the [rule] is vague *in* [*its*] *case*."  *Branson*, 139 F.4th at 478 (quotation marks omitted).

Defense Distributed has not attempted to make that showing.  It does not explain

why its proposed conduct—dealing in six particular products—presents vagueness

problems under the rule.  In fact, at one point, it expressly concedes that "its

predecessor parts fall within the provision's reach."  Br. 13.  And although Defense

Distributed later claims that the rule "is vague … as applied," Br. 18, it fails to

develop that conclusory assertion.  In the absence of any argument that the rule is

21

vague as applied to Defense Distributed's products, its void-for-vagueness claim must fail. *See Branson*, 139 F.4th at 478; *Village of Hoffman*, 455 U.S. at 500 (vagueness challenge fails where "at least some of the items [at issue] are covered" by the law).

Defense Distributed's protestations are especially unconvincing given that it has rebuffed ATF's offers to classify its products through the administrative process established by the rule. *See* ROA.5515-17, 5562-63. Defense Distributed's steadfast refusal to avail itself of that process should preclude it from now seeking to enjoin the rule on the basis of purported concerns that could have been resolved through ATF's process.

Defense Distributed instead attacks the classification process it has not invoked—protesting that the process is optional, is "item-specific to the point of uselessness," is "internally incoherent," and is insufficient in the face of a rule that "reaches fundamental liberties, not just commercial interests." Br. 16-18. But these undeveloped assertions lack merit. If Defense Distributed had attempted to avail itself of the classification process and ATF had declined to participate, then obviously the mere existence of that process would cease to be relevant to the vagueness analysis. And it is hard to see how "item-specific" classifications would be "useless[]" where they would directly inform Defense Distributed of the agency's view of whether the specific items discussed in its motion are covered under the GCA. Br. 17. If Defense Distributed were truly suffering the harms that it alleges from uncertainty about whether its products are covered, one would expect it to act

22

expeditiously to obtain classifications that would resolve that uncertainty—and could permit it to sell some of its products without a license. Moreover, Defense Distributed provides no reason for believing that ATF's classifications are "internally incoherent," beyond noting, without elaboration, that ATF has classified two different items differently. *Id.* Finally, Defense Distributed asserts that the rule touches on "fundamental liberties, not just commercial interests." *Id.* Even if that were correct, Defense Distributed does not explain why that would alter the vagueness analysis— itself a constitutional doctrine protecting fundamental liberties that has long recognized that the existence of an administrative process for "clarify[ing]" matters reduces vagueness concerns. *Clinical Leasing Serv.*, 925 F.2d at 122 (quoting *Village of Hoffman*, 455 U.S. at 498). And in any event, as explained below, Defense Distributed has no plausible Second Amendment claim, not least because it has no Second Amendment rights at all that could be implicated by the rule.

3. Defense Distributed's highly general vagueness arguments would fail in any event. Defense Distributed focuses on the supposed vagueness of the word "readily," which it calls the rule's "central vagueness flaw." Br. 12. That is a surprising choice, both because "qualifier[s]" like this normally make a phrase "more definite, not less," *City of El Cenizo*, 890 F.3d at 190, and because the word "readily" is used repeatedly throughout the federal firearms laws in a nearly identical manner, including in the GCA's statutory definition of firearms, *see* 18 U.S.C. § 921(a)(3)(A); *see also, e.g.*, 26 U.S.C. § 5845(b), (c), (d), (f), (h), with courts sustaining such usages against

vagueness challenges, *see, e.g.*, *United States v. Kent*, 175 F.3d 870, 873-74, 878 (11th Cir. 1999) (discussing 26 U.S.C. § 5845(c)); *United States v. Quiroz*, 449 F.2d 583, 585 (9th Cir. 1971) (discussing 18 U.S.C. § 921(a)(3)). Defense Distributed does not suggest that these laws are unconstitutionally vague, and it offers no basis for distinguishing those presumably permissible uses of the term from the rule's supposedly unconstitutional use of it.

On substance, Defense Distributed's argument rests almost entirely on a supposed analogy between the term "readily" and the impermissibly vague "residual clause" of the Armed Career Criminal Act that the Supreme Court invalidated in *Johnson*. *See* Br. 12-14. But that analogy fails. The residual clause required an enhanced prison sentence if a defendant had previously been convicted of a felony "involv[ing] conduct that presents a serious potential risk of physical injury to another." *Johnson*, 576 U.S. at 594 (emphasis omitted) (quotation marks omitted). In effect, the residual clause instructed courts to imagine an "'ordinary case' of a crime," and then to apply an "imprecise 'serious potential risk' standard" to that "judge-imagined abstraction." *Id.* at 597-98. Those "combin[ed]" features created "more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.* at 598. But the Court made clear that it was not suggesting that the "imprecise 'serious potential risk' standard" *on its own* was unconstitutionally vague. *See id.* at 597-98, 603-04. On the contrary, the Court reiterated that laws "call[ing] for the application of a qualitative standard … to real-world conduct" do not, generally speaking, raise due-

24

process concerns. *Id.* at 604. The problem in *Johnson* arose from the need to apply such a standard to an "idealized ordinary case of the crime"—a judge-constructed hypothetical untethered to any actual facts. *Id.*

ATF's rule calls for nothing of the sort. A determination that a particular part or kit qualifies as a "frame or receiver" under the rule is strictly tied to the concrete, factual particulars of that part or kit. Indeed, the detail-oriented, fact-based factors that ATF considers in making determinations under the rule would make no sense at all otherwise. *See* 27 C.F.R. § 478.11 (specifying factors relevant to the "readily" analysis, including the time, equipment, and expertise required to complete a frame or receiver); *id.* § 478.12(c) (specifying the sorts of associated items included in a kit that ATF may consider relevant to its classification determinations). The rule, in short, directs ATF to look at the specific, real-world materials before it and determine whether it is "fairly or reasonably efficient, quick, and easy" to complete the frame or receiver. *Id.* § 478.11. *Johnson* approved precisely such "qualitative standard[s]" applied to "real-world" facts. 576 U.S. at 604.

Counterintuitively, Defense Distributed also suggests that the rule's clarifications concerning the exclusion of "a forging, casting, printing, extrusion, unmachined body, or similar article" and concerning the role of a kit's accompanying "templates, jigs, molds," and other materials in ATF's classifications *add to* the purported vagueness problems. *See* Br. 13-14. But, as discussed, these definitional provisions further *clarify* the scope of the rule. The former clarification underscores

25

the exclusion of early-stage materials from the scope of the rule unless they are "clearly identifiable as an unfinished component part of a weapon." 27 C.F.R. § 478.12(c); *see VanDerStok*, 604 U.S. at 465. And although the phrase "clearly identifiable," like countless other legal standards, surely admits of "marginal situations," *Lim*, 444 F.3d at 916, it cannot plausibly be said that this definitional provision does anything but clarify the rule's reach. Indeed, the provision was added in response to firearms-industry commenters to provide additional clarity to the rule's definition. 87 Fed. Reg. at 24,700.

Moreover, the provision explaining that ATF will "consider any associated templates, jigs, molds," or other similar materials sold with a part or kit simply informs the public that ATF will employ common sense in evaluating whether a part or kit may readily be made functional. Defense Distributed says that the rule "gives ATF no rule for using" these accompanying items in its assessment. Br. 14. But that objection is senseless. The point of ATF's assessment is to determine whether a part or kit "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). To the extent that accompanying templates, jigs, molds, tools, and the like help a user to bring the "unfinished object" to its "intended function," they are naturally relevant to that analysis. *VanDerStok*, 604 U.S. at 471.

## C.    Defense Distributed is not likely to succeed on the merits of its Second Amendment claim.

Defense Distributed wishes to be able to deal in six products "free from" the GCA's conditions on commercial transactions in firearms.  ROA.5491.  And it claims that, by clarifying that the GCA's requirements apply to unfinished frames or receivers and kits that "may readily be" made functional, the rule burdens Second Amendment rights.  27 C.F.R. § 478.12(c).  Defense Distributed is not likely to succeed on the merits of this claim.

To "secure[] for Americans a means of self-defense," the Second Amendment guarantees an individual right to keep and bear arms.  *United States v. Rahimi*, 602 U.S. 680, 690 (2024).  Like most rights, the right to keep and bear arms "is not unlimited." *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).  Its contours are "delineate[d]" both by "'constitutional text'" and by our Nation's "'historical tradition of firearm regulation.'"  *Id.* at 691 (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17, 22 (2022)).  The Supreme Court accordingly has set out a two-step analysis to determine whether a law violates the Second Amendment.  A court first must ask whether "the Second Amendment's plain text covers" the conduct regulated by the law.  *Bruen*, 597 U.S. at 24.  If it does not, there is no Second Amendment violation.  If it does, the conduct is "'presumptively' protect[ed]" by the Second Amendment, and the government must justify regulation of that conduct by showing that it "is consistent with the principles that underpin our regulatory tradition."  *United*

27

*States v. Hemani*, 608 U.S. __, 146 S. Ct. 1677, 1685-86 (2026) (quotation marks omitted).

1.       As a threshold matter, Defense Distributed lacks Second Amendment rights of its own, and thus cannot press a Second Amendment claim here.  The Second Amendment protects "an individual right to keep and bear arms."  *Heller*, 554 U.S. at 595.  Defense Distributed is not an individual who seeks to keep and bear arms, but a business entity that seeks to deal in firearms.

To the extent Defense Distributed wishes to assert the Second Amendment rights of its customers, it lacks third-party standing to do so.  Ordinarily, a plaintiff "must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Courts have permitted an exception to this limitation only if the plaintiff can show (1) that it and the third party have "'a close relation,' such that 'their interests coincide,'" and (2) that "a 'genuine obstacle' prevent[s] the third party from 'protecting his or her own interests.'"  *In re Deepwater Horizon*, 857 F.3d 246, 252-53 (5th Cir. 2017) (citation modified).  Defense Distributed has not attempted to make either showing.  Even assuming that Defense Distributed's interests may roughly align with its customers', Defense Distributed has provided no reason to think that its customers face any difficulty in asserting their own Second Amendment rights.  *See, e.g., Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1210 (5th Cir. 1991) (per curiam) (no third-party standing where party whose rights were at issue was "fully capable of asserting its own

28

rights"). Accordingly, it cannot press a Second Amendment claim premised on the rights of others in this case.

2. Regardless, ATF's rule does not burden Second Amendment rights. The rule does not prohibit anyone from engaging in the business of selling or manufacturing any firearm, provided that the entity or person obtains a license to do so; nor does it prevent anyone who is not engaged in the business of manufacturing firearms from making his or her own firearm (for example, for individual use). *See, e.g.*, 87 Fed. Reg. at 24,655-56, 24,669-70, 24,686-87. The rule simply makes clear that certain unfinished frames or receivers and kits are "firearms" subject to the GCA, and thus that dealers and manufacturers must obtain licenses to conduct business and must comply with serialization, recordkeeping, and background-check requirements for those firearms as they must for all others. Any burden on Second Amendment rights, therefore, would ultimately trace to the GCA. But the GCA's commercial conditions do not meaningfully affect conduct protected by the Second Amendment, and Defense Distributed itself disclaims (at 27) any challenge to the GCA's requirements. *See, e.g.*, *Heller*, 554 U.S. at 626-27, 627 n.26 ("[L]aws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful.").

The GCA's licensing regime is a "shall-issue" regime, meaning that it "contain[s] only narrow, objective, and definite standards guiding licensing officials." *McRorey v. Garland*, 99 F.4th 831, 837, 839 (5th Cir. 2024) (quoting *Bruen*, 597 U.S. at

38 n.9). If those "objective[] and definite" requirements are met, *Bruen*, 597 U.S. at 38 n.9, ATF is required to issue licenses to applicants who satisfy the conditions for obtaining one. *See* 18 U.S.C. § 923(a), (d); *United States v. Vlha*, 142 F.4th 1194, 1199 (9th Cir. 2025) ("The licensing scheme that Congress created here is not discretionary … ."). This Court has squarely held that "*Bruen* … implement[s] a 'presumption' of constitutionality for shall-issue 'ancillary firearm regulations.'" *United States v. Peterson*, 161 F.4th 331, 339 (5th Cir. 2025); *see McRorey*, 99 F.4th at 837, 839. That is because the "plain text" of the Second Amendment does not confer a right to purchase firearms without any "ancillary firearm regulations such as background checks preceding sale." *McRorey*, 99 F.4th at 837-38; *Peterson*, 161 F.4th at 339 (quotation marks omitted). Nor does it confer a right to sell firearms without any regulatory conditions whatsoever. *Vlha*, 142 F.4th at 1200.

Of course, these types of ancillary regulations may infringe the Second Amendment if in practice they amount to a "functional prohibition" on acquiring firearms. *Reese v. ATF*, 127 F.4th 583, 590 n.2 (5th Cir. 2025); *see Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023) (per curiam). Otherwise, though, such regulations are unproblematic because they do not "prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Bruen*, 597 U.S. at 38 n.9.

Put simply, so long as they are not "put toward abusive ends," *Bruen*, 597 U.S. at 38 n.9, and do not "meaningfully constrain would-be purchasers from obtaining firearms," *Vlha*, 142 F.4th at 1200; *accord McRorey*, 99 F.4th at 838, conditions like

30

shall-issue regimes are "permissible," *Peterson*, 161 F.4th at 339 (citing *Bruen*, 597 U.S. at 38 n.9). Defense Distributed has not even attempted to argue that the GCA's requirements are put toward abusive ends or functionally prohibit anyone from obtaining firearms. Its "failure to make any showing as to how the requirement[s] place[] an unconstitutional burden on … Second Amendment rights alone is dispositive" of this case. *Id.*; *accord United States v. Comeaux*, 179 F.4th 297, 302 (5th Cir. 2026).

To the extent Defense Distributed purports (at 23) to assert the rights of its customers, it fails to explain how the rule infringes their rights. *Cf. Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1018 (8th Cir. 2023) (stating, in a challenge to the same rule, that "we are left unsure how the Final Rule—that creates no new obligations on individuals—will prevent individuals from engaging in protected Second Amendment activity"). Its customers remain subject to the GCA to the exact same extent that they were before the rule. The rule, again, simply clarifies the scope of the GCA's application to manufacturers and dealers, and Defense Distributed does not attempt to show how that clarification has somehow limited its customers' ability to exercise their Second Amendment rights. Indeed, given that Defense Distributed has failed to show that several of its products are likely regulated by ATF's understanding of the GCA *at all*, and has likewise failed to obtain any determination from ATF on that question, it is difficult to see how Defense Distributed could meaningfully argue that the rule infringes anyone's rights with respect to its products.

3.     Defense Distributed's arguments are largely premised upon mischaracterizations of what the rule does, and in particular its relationship to the GCA. As explained, the rule simply "clari[fies]" that covered parts or kits are subject to the GCA, and thus that "companies" must "run[] background checks," "maintain[] transaction records," and otherwise comply with the GCA's requirements "when they manufacture and sell" them, as they do with other firearms. 87 Fed. Reg. at 24,663. And as discussed, the Supreme Court has already squarely addressed one of the products at issue here—the Polymer80 frame—and held that it and "product[s] like [it]" are covered by the GCA. *VanDerStok*, 604 U.S. at 478-79, 481. The Court relied on that example in part to determine that the rule here accurately reflects the GCA's requirements, as at least some weapon parts kits and unfinished frames and receivers are covered "firearms" under the GCA. *Id.* at 468, 477. And Defense Distributed has not disputed that the two M1911 products at issue here are materially indistinguishable from the Polymer80 frame, and thus also covered by the GCA. ROA.5550. *See generally* ROA.5590-602.

Yet Defense Distributed, as noted, disclaims any challenge to the GCA's requirements. Br. 27. And Defense Distributed never explains why it believes its other three products would be covered by the rule (but not the GCA itself), and has never availed itself of the administrative process for obtaining ATF's view of whether those products are covered by the GCA. Defense Distributed can hardly now seek to challenge the rule as an impermissible infringement of anyone's Second Amendment

32

rights based on the abstract view that the rule might in some undefined circumstances infringe the Second Amendment.

Defense Distributed's efforts to attack an entirely different, seemingly imagined rule underscore the point. Defense Distributed describes the rule variously as: "criminalizing firearm parts, unfinished frames or receivers, or private arms-making," Br. 7; "criminalizing personal gunsmithing parts and kits," Br. 22; "outlawing the parts used to make [firearms]," Br. 24; "controlling who may bear Arms," *id.*; and "preventing manufacture" of firearms, Br. 25.

None of these characterizations is remotely accurate. The rule does not criminalize any firearm parts, prevent anyone from manufacturing firearms non-commercially, or otherwise affect who may lawfully possess firearms. "[The] rule does not restrict law-abiding citizens' ability to make their own firearms from parts for self-defense or other lawful purposes," 87 Fed. Reg. at 24,686-87, or otherwise "impose any new requirements on law-abiding gun owners," *id.* at 24,670. The rule simply clarifies that commercial transactions in certain unfinished frames or receivers and kits—those that may readily be made into functional frames or receivers—must comply with the GCA. The legal force of any requirements thus stems from the GCA—which Defense Distributed does not challenge—rather than the rule itself.

Defense Distributed's specific efforts at historical analysis further illustrate the point. Rather than engage with the historical tradition—discussed in our papers below—of regulations on commercial sales of firearms and gunpowder, *see, e.g.,*

ROA.5543-46; *see also United States v. Vereen*, 152 F.4th 89, 102 (2d Cir. 2025) (describing tradition of laws that "ensure compliance with proper channels of firearm acquisition and prevent potentially dangerous individuals from acquiring weapons"), Defense Distributed gestures at a purported tradition of riflemakers "'purchas[ing] [barrel blanks] in bulk from some factory,' then fitt[ing] them to hand-made stocks with factory or imported locks," Br. 26 (second alteration in original) (quoting John G.W. Dillin, *The Kentucky Rifle* 96 (1975)).  It further asserts that "ingredient parts" were never "treated as a gun," and that "'[g]unsmiths considered it to be their right to make guns without regulation or interference.'"  *Id.* (alteration in original) (quoting James B. Whisker, *The Gunsmith's Trade* 90 (1992)).

Whatever the historical soundness of these asserted traditions, they certainly have little if anything to do with the rule, and much less do they explain how the rule creates any meaningful difference from the GCA.  For one, the rule expressly disclaims coverage of "a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon."  27 C.F.R. § 478.12(c).  And ATF specifically explained that the rule does not apply to "unfinished … blanks" when they are not sold with "any associated jigs, templates, or similar tools to the same customer."  87 Fed. Reg. at 24,700; *see* 27 C.F.R. § 478.12(c) (examples).  The rule thus does not impose any new restrictions on "ingredient parts."  The rule does clarify what products constitute frames and receivers—and thus "firearms"—

34

regulated by the GCA. But if Defense Distributed's complaint is that frames and receivers are regulated by federal law, then that is an issue with the GCA (which Defense Distributed does not challenge), not with the rule. *See* 18 U.S.C. § 921(a)(3)(B). If its complaint is that the rule sweeps beyond the limits of the statute in determining what qualifies as a "firearm," then the rule to that extent has no legal effect. And that question cannot be answered in the abstract; as discussed, Defense Distributed does not attempt to show that its products are improperly regulated, and has refused to seek ATF's view of whether those of its products not already addressed by the Supreme Court are covered by the GCA.

The same is true of Defense Distributed's more general contention that there is "an established tradition" of "[s]elf-manufacture of firearms in America." Br. 25. That assertion has no apparent relation to the rule, which does not address self-manufacture of firearms. 87 Fed. Reg. at 24,686-87. As far as the GCA is concerned, individuals are as free to manufacture firearms on their own today as they were before the rule was issued. What the rule makes clear is that parts or kits described in the rule are subject to the GCA's requirements. If an individual considers assembling one of these parts or kits to be an exercise of "self-manufacture," the individual is free to engage in that exercise, provided he or she complies with any relevant provisions of the GCA. If an individual wishes to manufacture a firearm from materials or parts that are not subject to the GCA, the rule does nothing to affect the status of that process or the resulting product under the GCA. Indeed, ATF itself has reiterated

that "privately made firearms" are not subject to the GCA "when made for personal use." *Id.* at 24,655-56; *see id.* at 24,669-70.

Thus, even aside from Defense Distributed's lack of Second Amendment rights and this Court's precedent regarding commercial and licensing restrictions, Defense Distributed has no colorable Second Amendment claim as to the rule. The only legal obligations that could apply to Defense Distributed flow from the GCA, which it expressly does not challenge. And at this stage, Defense Distributed has failed entirely to demonstrate that the rule has, or could have, any independent effect with relation to its products that could give rise to a Second Amendment claim.

## II. None Of The Other Equitable Factors Weighs In Favor Of Defense Distributed.

To obtain a preliminary injunction, Defense Distributed must also show that it will face irreparable harm in the absence of preliminary relief and that the balance of harms and the public interest weigh in favor of issuing such relief. Where, as here, the government opposes the injunction, "[t]he balance-of-harms and public-interest factors merge." *Career Colls.*, 98 F.4th at 254. Because Defense Distributed is not likely to succeed on the merits, this Court need not consider the other preliminary-injunction factors. *See Siders v. City of Brandon*, 123 F.4th 293, 309 (5th Cir. 2024). Nonetheless, those factors also weigh decidedly against Defense Distributed.

1. Most importantly, Defense Distributed has failed to establish that it will suffer irreparable harm in the absence of a preliminary injunction. *See Career Colls.*, 98

F.4th at 233 (irreparable harm and likelihood of success "are the most critical" factors (quotation marks omitted)). It asserts two kinds of irreparable harm: "constitutional injury" and "unrecoverable economic injury." Br. 27-28. Neither is persuasive.

For the reasons explained above, Defense Distributed cannot demonstrate constitutional injury because neither of its constitutional arguments is likely to succeed—indeed, Defense Distributed does not even have standing to pursue relief on these grounds. And even if it could overcome those fatal defects in its merits arguments, Defense Distributed never identifies what its supposed constitutional injury is. As discussed, it fails to explain why it considers the rule vague as applied to any of its products, why it has Second Amendment rights, or what Second Amendment-protected conduct, if any, it wishes to engage in, but believes it cannot engage in due to the rule. That Defense Distributed believes the rule violates the Constitution in the abstract does not establish that Defense Distributed itself is in any way injured by the rule.

Nor has Defense Distributed established that a preliminary injunction is necessary to prevent it from suffering unrecoverable economic injury. Its supposed economic injury falls into two classes: injury relating to the G80 products, and injury relating to the Polymer80 and M1911 products. With respect to the G80 products, which Defense Distributed did not intend to deal in until after the rule took effect, Defense Distributed has acknowledged that ATF has not taken a position on whether those products are subject to the GCA and has not taken any enforcement action as

37

to those products. *See* ROA.5513. Nor does Defense Distributed appear to take a position on how it believes the products should be classified; it simply laments the costs of "deciphering" the rule. Br. 28. To the extent Defense Distributed is suffering any cognizable economic injury as a result of uncertainty regarding the status of the G80 products, that injury is entirely self-inflicted. The rule specifically provides Defense Distributed a means of ascertaining whether a product is a frame or receiver under the GCA by submitting it to ATF for a classification determination, *see* 27 C.F.R. § 478.92(c), and ATF has expressly offered to provide an "expedited" determination to Defense Distributed, *see* ROA.5563. And if Defense Distributed ultimately disagrees with ATF's determination, it may challenge that determination in district court and obtain de novo judicial review of the question whether the GCA applies to the product in question. But Defense Distributed has declined to avail itself of the opportunity to obtain an administrative and judicial determination that may wholly address any injury with respect to the G80 products. Thus, any injury is "self-inflicted and therefore do[es] not count" in the irreparable-harm analysis. *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam).

With respect to the Polymer80 and M1911 products, Defense Distributed suffers no injury at all from the rule. As discussed above, *supra* p. 12-13, the Supreme Court's *VanDerStok* decision makes clear that those products are firearms under 18 U.S.C. § 921(a)(3)(B), and thus subject to the GCA. *VanDerStok*, 604 U.S. at 479, 481.

As to them, the rule inflicts no harm on Defense Distributed, irreparable or otherwise.

To the extent Defense Distributed asserts some freestanding harm related to the fact that a single bank and a single insurance agency declined it services within the last year, *see* Br. 29; ROA.6179-80, this falls far short of demonstrating irreparable harm. The declarations from the bank representative and the insurance-agency representative (who were specifically selected by Defense Distributed) do not claim that those companies are prohibited by the rule or other federal law from providing services to Defense Distributed. Those companies' decisions are simply "the independent action[s] of some third part[ies] not before the court," and thus not "fairly traceable to the challenged" rule. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). They do not suffice to establish standing and certainly do not suffice to establish irreparable harm.

Even assuming that these third parties' denial of banking and insurance services could amount to irreparable harm, Defense Distributed's evidence is woefully inadequate to support its claim. The two representatives do not (and could not) purport to speak for their entire industries, and do not promise that those companies would provide services to Defense Distributed if it obtained the relief it seeks here. Nor do their declarations describe with any degree of specificity—beyond general references to the rule—the basis on which those companies determined that providing services to Defense Distributed would expose them to risk they deem

unacceptable. *See* ROA.6179-80. They do not come close to showing that Defense

Distributed will be cut out of the banking or insurance markets absent a preliminary

injunction, or conversely that a preliminary injunction would prevent such an

occurrence.

2. The balance of harms and public interest likewise favor the government.

Indeed, the Supreme Court twice concluded as much—first when it stayed vacatur of

the rule, *Garland v. VanDerStok*, 144 S. Ct. 44 (2023), and then when it vacated a

subsequent injunction issued for the benefit of Defense Distributed and one other

plaintiff, *Garland v. Blackhawk Mfg. Grp., Inc.*, 144 S. Ct. 338 (2023). As the Court has

explained, its "interim orders … inform how a court should exercise its equitable

discretion in like cases." *Trump v. Boyle*, 606 U.S. __, 145 S. Ct. 2653, 2654 (2025).

Defense Distributed does not even acknowledge that the Supreme Court has already

weighed the equities in this dispute—nor does it argue that intervening developments

require a different weighing of the equities now. Thus, because the equities "do[] not

otherwise differ … in any pertinent respect" from the previous two times the

Supreme Court exercised its equitable discretion in this same litigation, the same result

should obtain here. *Id.*

Even setting the Supreme Court's prior rulings aside, the government and the

public have a strong interest in the continued, full enforcement of the relevant

provisions of the rule, which respond to the serious problem of the proliferation of

ghost guns for criminal purposes. *See VanDerStok*, 604 U.S. at 464 (describing "'an

40

explosion of crimes' involving these 'ghost guns'"); *see also* 87 Fed. Reg. at 24,658 ("The problem of untraceable firearms being acquired and used by violent criminals and terrorists is international in scope," and "untraceable firearms pose a challenge to law enforcement's ability to investigate crimes.").

By contrast, Defense Distributed suffers minimal if any burden from the continued enforcement of the rule. To the extent the rule has had any effect on Defense Distributed by clarifying its obligations under the GCA, Defense Distributed has not pointed to any reason that it cannot obtain a federal firearms license and continue its business operations consistent with the GCA.

Moreover, Defense Distributed's conduct weighs sharply against an exercise of equitable discretion in its favor. Defense Distributed has refused to obtain clarification regarding its alleged injuries through the administrative process that ATF has made available, despite ATF's express offer to provide a classification on an expedited basis. And, as the district court recognized when it denied its request for an injunction pending this appeal, *see* ROA.6211, Defense Distributed has conducted this litigation in highly piecemeal fashion, draining valuable resources of both the courts and the government.

In short, the equities weigh decidedly in favor of the government.

## CONCLUSION

For the foregoing reasons, this Court should deny the preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

RYAN RAYBOULD
  *United States Attorney*


BRAD HINSHELWOOD

  *s/ Domenic Canonico*
DOMENIC CANONICO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7246*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-8189*
  *domenic.canonico@usdoj.gov*

August 2026

# CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Domenic Canonico*
Domenic Canonico

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,537 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Domenic Canonico*
Domenic Canonico

**ADDENDUM**

# TABLE OF CONTENTS

18 U.S.C. § 921............................................................................................A1

27 C.F.R. § 478.11 ......................................................................................A2

27 C.F.R. § 478.12 ......................................................................................A3

27 C.F.R. § 478.92 ......................................................................................A5

**18 U.S.C. § 921**

## § 921. Definitions

**(a)** As used in this chapter --

∗ ∗ ∗

**(3)** The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

**27 C.F.R. § 478.11**

**§ 478.11. Meaning of terms.**

When used in this part and in forms prescribed under this part, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof, terms shall have the meaning ascribed in this subpart. * * *

* * *

*Firearm.* Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics. The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive. The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed as described in the definition "frame or receiver".

* * *

*Readily.* A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state. With respect to the classification of firearms, factors relevant in making this determination include the following:

(1) Time, *i.e.*, how long it takes to finish the process;

(2) Ease, *i.e.*, how difficult it is to do so;

(3) Expertise, *i.e.*, what knowledge and skills are required;

(4) Equipment, *i.e.,* what tools are required;

(5) Parts availability, *i.e.,* whether additional parts are required, and how easily they can be obtained;

(6) Expense, *i.e.,* how much it costs;

(7) Scope, *i.e.,* the extent to which the subject of the process must be changed to finish it; and

(8) Feasibility, *i.e.,* whether the process would damage or destroy the subject of the process, or cause it to malfunction.

**27 C.F.R. § 478.12**

**§ 478.12. Definition of Frame or Receiver.**

(c) *Partially complete, disassembled, or nonfunctional frame or receiver.* The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, *i.e.,* to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.,* unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit. The following are nonexclusive examples that illustrate the definitions:

*Example 1 to paragraph (c) – Frame or receiver:* A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver.

*Example 2 to paragraph (c) – Frame or receiver:* A partially complete billet or blank of a frame or receiver with one or more template holes drilled or indexed in the correct location is a frame or receiver, as a person with common hand tools may readily complete the billet or blank to function as a frame or receiver.

*Example 3 to paragraph (c) – Frame or receiver:* A complete frame or receiver of a weapon that has been disassembled, damaged, split, or cut into pieces, but not destroyed in accordance with paragraph (e), is a frame or receiver.

*Example 4 to paragraph (c) – Not a receiver:* A billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver.

*Example 5 to paragraph (c) – Not a receiver:* A flat blank of an AK variant receiver without laser cuts or indexing that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools is not a receiver, as a person cannot

readily fold the flat to provide housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence.

**27 C.F.R. § 478.92**

**§ 478.92. Identification of firearms and armor piercing ammunition by licensed manufacturers and licensed importers.**

(c) *Voluntary classification of firearms and armor piercing ammunition.* The Director may issue a determination (classification) to a person whether an item, including a kit, is a firearm or armor piercing ammunition as defined in this part upon receipt of a written request or form prescribed by the Director. Each such voluntary request or form submitted shall be executed under the penalties of perjury with a complete and accurate description of the item or kit, the name and address of the manufacturer or importer thereof, and a sample of such item or kit for examination. A firearm sample must include all accessories and attachments relevant to such classification as each classification is limited to the firearm in the configuration submitted. Each request for classification of a partially complete, disassembled, or nonfunctional item or kit must contain any associated templates, jigs, molds, equipment, or tools that are made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit, and any instructions, guides, or marketing materials if they will be made available by the seller or distributor with the item or kit. Upon completion of the examination, the Director may return the sample to the person who made the request unless a determination is made that return of the sample would be or place the person in violation of law. Submissions of armor piercing ammunition with a projectile or projectile core constructed entirely from one or a combination of tungsten steel alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium must include a list of known handguns in which the ammunition may be used. Except for the classification of a specific component as the frame or receiver of a particular weapon, a determination made by the Director under this paragraph shall not be deemed by any person to be applicable to or authoritative with respect to any other sample, design, model, or configuration.